UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FUNDS IN THE AMOUNT OF $830,000 | ) | |
| IN UNITED STATES CURRENCY, | ) | |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

**VERIFIED COMPLAINT FOR FORFEITURE**

The United States of America, by John R. Lausch, Jr., United States Attorney for the Northern District of Illinois, for its verified complaint against the above-named defendant funds alleges in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure as follows:

**Nature of the Action**

1. This is a forfeiture *in rem* brought pursuant to 21U.S.C. § 881(a)(6), for forfeiture of the defendant funds in the amount of $830,000.

2. This complaint is verified by the attached affidavit of Drug Enforcement Administration ("DEA") Task Force Agent ("TFO") Arnold Martinez, which is fully incorporated herein.

**Jurisdiction and Venue**

3. This Court has jurisdiction over an action commenced by the United States as the plaintiff under 28 U.S.C. § 1345, and over an action for forfeiture *in rem* under 28 U.S.C. § 1355(a).

4. This Court has *in rem* jurisdiction over the defendant funds pursuant to 28 U.S.C. § 1355(b)(1)(A), as certain of the acts giving rise to the forfeiture occurred within the Northern District of Illinois.

5. Venue is proper under 28 U.S.C. §§ 1355(b)(1)(A) and 1395(a) as certain of the acts giving rise to the forfeiture occurred within the Northern District of Illinois, and 28 U.S.C. § 1395(b) as the defendant funds were found within the Northern District of Illinois.

6. The defendant funds are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) as the funds (i) were furnished and intended to be furnished in exchange for a controlled substance; and/or (ii) are the proceeds from the sale of a controlled substance; and/or (iii) were funds used and intended to be used to facilitate narcotics trafficking, in violation of 21 U.S.C. § 841, *et seq.*

**Specific Allegations**

7. On December 1, 2017, DEA law enforcement officers assigned to the DEA Chicago Interdiction Task Force Group were alerted to the suspicious travel itinerary of Lev Sigal ("Sigal") and Nikolay Antonov ("Antonov").

8. Specifically, Sigal and Antonov were traveling together in a private, first class, room from Chicago Union Station to Emeryville, California on Amtrak Train #5. Sigal originally purchased the tickets on November 22, 2017, for travel that same day. However, Sigal exchanged the tickets for a higher priced ticket for travel to begin on December 1, 2017, with the same itinerary. The tickets were for one-way travel and purchased for $1,107 with Sigal's credit card.

9. Based upon his training and experience, the affiant states that drug proceed couriers often purchase one-way tickets, travel alone, and usually buy their tickets a day or so prior to the scheduled departure and, in order to avoid detection, purchase private berths. Additionally, the affiant states that Emeryville, California, is a known source area for marijuana drug trafficking.

Further, based upon the affiant's training and experience, those who transport illegal drugs, or the proceeds of illegal drug trafficking, often keep them on their person or accompanying bags or suitcases. Based upon the above information, DEA agents sought to interview Sigal and Antonov while they were at Union Station.

10. On December 1, 2017, at approximately 1:40 p.m., Special Agent Kevin Frankel ("SA Frankel") and TFO Arnold Martinez arrived at Amtrak Train #5 to interview Sigal and Antonov. SA Frankel and TFO Martinez were dressed in casual civilian attire, with no weapons, radios or other police paraphernalia visible. In an attempt to assist in locating Sigal and Antonov, agents obtained a photograph of Sigal through an open internet resource. SA Frankel and TFO Martinez went to Room 20 and immediately located Sigal as he was entering his room. Another individual was already seated in an accompanying seat.

11. At the time, TFO Martinez asked the two men their names. Sigal stated he was Lev Sigal while the other individual identified himself as "Niko Antonov." TFO Martinez identified himself to Sigal and Antonov by displaying his credentials and badge and asked to speak with them. TFO Martinez further advised Sigal and Antonov that they were not under arrest and were not in any kind of trouble. At the time, to the agents, Sigal appeared to be very nervous and visibly upset. SA Frankel again advised Sigal that he was not in trouble and to sit down and relax. Sigal and Antonov agreed to speak with SA Frankel and TFO Martinez.

12. TFO Martinez asked Sigal if he could see a photo identification and his boarding pass. Sigal handed TFO Martinez his boarding pass, noted the information, and handed it back to Sigal. TFO Martinez observed that Sigal appeared to be extremely nervous when retrieving his driver's license from his wallet. He then handed a State of California driver's license bearing his name and likeness to TFO Martinez, who examined the license and immediately returned the

license to Sigal.

13. TFO Martinez asked Antonov if he could see a photo identification and his boarding pass. Antonov handed TFO Martinez his boarding pass, noted the information, and handed it back to Antonov. Upon request, Antonov produced a State of California driver's license bearing his name and likeness. TFO Martinez examined the license and immediately returned the license to Antonov.

14. TFO Martinez then asked Sigal and Antonov the purpose of their trip on Amtrak. Both Sigal and Antonov stated that they were on vacation and were returning home. When asked the city they were traveling from, Sigal stated Chicago. Sigal also stated they were returning home to San Francisco.

15. TFO Martinez informed Sigal and Antonov that since Chicago Union Station does not have TSA officers or x-ray machines to check passengers for weapons and illegal contraband, random interviews are conducted for the safety of passengers and Amtrak employees. Sigal and Antonov both stated that they understood.

16. When TFO Martinez asked Sigal and Antonov if they had any checked luggage, Sigal stated that they did not check any luggage and all of their bags were with them in their room. TFO Martinez asked Sigal and Antonov if they packed their own bags, knew all the items in their bags, and if all the contents in their bags and on their persons were theirs. Sigal and Antonov both replied yes to all three questions.

17. TFO Martinez asked Sigal and Antonov if anyone had given them anything to put in their bags or on their persons to take to San Francisco for them. Both Sigal and Antonov replied no.

18. TFO Martinez asked Sigal and Antonov if they had any weapons. Sigal and

Antonov stated no. TFO Martinez asked them if they had any illegal drugs. Sigal stated "Nothing," while Antonov stated, "We are very wise travelers." When TFO Martinez asked Sigal and Antonov if they had any large amounts of United State currency or financial instruments on their persons or in their bags, Sigal stated "Zero." TFO Martinez asked Sigal if he had any money on him, to which Sigal replied that he had about $160 on his person, but no large amounts of money. Antonov stated that he did not have any large amounts of currency or checks.

19. When TFO Martinez asked for permission to search their luggage and person to verify their statements, both Sigal and Antonov gave agents consent to search their luggage and person.

20. At the time, SA Frankel asked Sigal and Antonov how long they had stayed in Chicago. Sigal stated "One night." SA Frankel then asked if they did anything while they were in Chicago. Antonov stated that they did not do anything and were just taking the train. TFO Martinez asked Antonov if he was just taking a train ride and not stopping in any states. Antonov stated "Yes, that's what we are doin." When SA Frankel asked where they spent the night in Chicago, Sigal stated "At the airport." SA Frankel asked Sigal if he had flown into Chicago. Sigal stated that he did not fly into Chicago but had gotten a car in New York and drove around, and they were going to take the train from Chicago. Sigal and Antonov could not clearly explain what their travels were or how they had arrived in Chicago.

21. At the time, Sigal handed SA Frankel his backpack to search and Antonov handed his backpack for TFO Martinez to search. Search of the two backpacks were negative for illegal contraband or currency.

22. TFO Martinez then observed a gray hardcover roller bag ("gray roller bag") in the corner of the room covered by a black coat. TFO Martinez asked Sigal if he could hand the gray

roller bag to him so that it could be searched. Sigal appeared to be reluctant to retrieve the roller bag and stated that the roller bag had a lock on it and he needed to unlock it. Sigal then attempted to unlock the lock with a key. TFO Martinez observed that Sigal's hand was visibly shaking and that he was having a hard time putting the key into the lock. Sigal finally opened the lock and pushed the roller bag over to TFO Martinez.

23. When TFO Martinez opened the gray roller bag, a large vacuum-sealed plastic bag containing bundles of cash fell. TFO Martinez observed large vacuum-sealed plastic bags containing bundles of cash inside the gray roller bag. When TFO Martinez asked Sigal what the vacuum-sealed bags of cash were, Sigal stated "Wow." When TFO Martinez asked Sigal if the bundles of cash were his, Sigal stated, "I don't think so." TFO Martinez found that the two vacuum-sealed bags contained numerous rubber band bundles of USC. *See* Exhibit A.

24. TFO Martinez asked Sigal the amount of cash contained in the two bags vacuum-sealed bags. Sigal stated that he did not know. When asked again who the cash belonged to, Sigal stated that he did not want to say anything that would get him in trouble later. TFO Martinez then asked Sigal his occupation. Sigal responded he was a software developer.

25. TFO Martinez also observed a black hardcover roller bag ("black roller bag") next to Antonov's legs. When TFO Martinez asked both Sigal and Antonov what was in that roller bag. Sigal stated "The same thing." Sigal stated there was money in the black roller bag. When TFO Martinez asked Antonov if he could hand over the black roller bag so that it could be searched, Antonov was hesitant and stated the bag had a lock on it. TFO Martinez then requested Antonov to open his bag. At the time, Antonov became extremely nervous as he attempted several times to unlock the combination lock, but eventually the lock opened.

26. Antonov then rolled the bag to SA Frankel to search. SA Frankel opened the roller

bag and found it to contain one large vacuum-sealed bag containing rubber-banded bundles of cash and a small black zipper duffel bag containing rubber-banded bundles of cash. *See* Exhibit B. When TFO Martinez asked Antonov if the money belonged to him, Antonov refused to speak. Sigal then spoke to Antonov in a foreign language.

27. TFO Martinez then asked Sigal the amount of cash contained in the two roller bags. Sigal stated he did not know for sure, but he knew it was not a million dollars. Antonov immediately spoke out stating that there are a lot of bundles of five-dollar bills in the roller bags.

28. TFO Martinez advised Sigal and Antonov that the cash was going to be detained for a canine sniff investigation. When TFO Martinez asked Sigal and Antonov if they had any deposit slips, bank withdrawal receipts, or any kind of electronic documentation explaining the source of the cash, Sigal stated that they did not have any of those documents with him.

29. TFO Martinez then informed Sigal and Antonov that they could accompany the agents to the DEA office at Chicago Union Station to obtain a receipt for the cash and continue with the interview or a receipt for cash could be sent by certified mailed to the address where they reside in California. Sigal stated, “I don’t want to.” TFO Martinez informed Sigal that there was a lot of cash in the bags and asked him if he was sure that he did not want to exit the train and obtain a receipt. Sigal stated, “The last thing I want to do is go with you.” Antonov also declined to leave the train in order to receive a receipt for the cash.

30. TFO Martinez informed Sigal and Antonov that if the cash did not belong to them, they might want a receipt as proof that it was detained by the DEA. Sigal informed agents that the gray roller bag was his, and the black roller bag belonged to Antonov and they were not worried about a receipt. TFO Martinez then confirmed with both Sigal and Antonov that the addresses shown on their respective driver's licenses is where the receipts should be mailed.

31. On December 1, 2017, at approximately 2:00 p.m., Amtrak Police Officer Robert Crowley and drug detector canine, "Gander," conducted a drug odor sniff investigation on the roller bags which contained the currency. Gander alerted positive to the presence of an illegal drug odor from the gray roller bag and the black roller bag.

32. Drug detector canine "Gander" is owned by the Amtrak Police Department and was last certified prior to this investigation on November 29, 2017 by the State of Illinois. Gander is certified to detect drugs, including the detection of cocaine, heroin, methamphetamine, and marijuana.

33. The gray roller bag contained $457,000 in cash in the following denominations: 654 one hundred dollar bills, 955 fifty-dollar bills, 16,890 twenty- dollar bills, 505 ten-dollar bills, and 200 five-dollar bills.

34. The black roller bag contained $373,000 in cash in the following denominations: 367 one hundred dollar bills, 407 fifty-dollar bills, 15,033 twenty-dollar bills, 389 ten-dollar bills, and 2,280 five-dollar bills. *See* Exhibit C.

35. On December 7, 2017, the cash was transported to Loomis, a cash handling company, where the currency was counted and directly deposited into an account maintained by the United States Marshal Service. In total, $830,000 in cash was recovered from Sigal and Antonov on December 1, 2017, including approximately 31,923 twenty-dollar bills.

**Conclusion**

36. For the reasons stated herein and in the attached affidavit, the defendant funds in the amounts of $830,00: (i) were monies furnished and intended to be furnished in exchange for a controlled substance; and/or (ii) are the proceeds from the sale of a controlled substance; and/or

(iii) were monies used or intended to be used to facilitate a narcotics transaction in violation of 21 U.S.C. § 841, *et seq*., and therefore are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE, the United States of America requests:

a. the defendant funds be proceeded against for forfeiture and condemnation;

b. due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed;

c. this court adjudge and decree that the defendant funds be forfeited to the United States and disposed of according to law; and

d. any trial in this matter be before a jury.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: *s/ Daniel E. May*

DANIEL E. MAY
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312)353-8694
daniel.may@usdoj.gov

STATE OF ILLINOIS )
) SS
COUNTY OF COOK )

AFFIDAVIT

Arnold J. Martinez, being duly sworn on oath, deposes and states as follows:

1. I am a Task Force Officer for the United States Drug Enforcement Administration (DEA since November 2015 where I am assigned to the Chicago Amtrak Union Station, Group 24. I am also a detective with the Amtrak Police Department and have been so employed for approximately 4 years. My duties and responsibilities as a TFO involve investigation of alleged violations of the controlled Substances Act, Title 21 of the United States Code. Prior to my employment with Amtrak, I was a Chicago Police Department officer for approximately 18 years. While employed there, I was assigned to the Gang/Narcotics Division where I investigated violations of the Illinois Controlled Substance Act and Cannabis Control Act.

2. I have read the complaint in this matter and the facts alleged are true and correct to the best of my knowledge and belief based upon my own personal knowledge as well as information I have received from other agents, persons and documents, and it does not include each and every fact known to me concerning this investigation but is submitted for the limited purpose of establishing a basis to believe the property identified is subject to forfeiture.

3. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 14 2018 in Chicago, Illinois.

ARNOLD J. MARTINEZ
Task Force Officer
Drug Enforcement Administration




EXHIBIT A
GRAY
ROLLING BAG



EXHIBIT B
BLACK
ROLLING BAG



EXHIBIT C
TOTAL USC
SEIZED