| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 01537 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| FUNDS IN THE AMOUNT OF $830,000 | ) | |
| IN UNITED STATES CURRENCY, | ) | |
| | ) | |
| Defendant In Rem. | ) | |

## MEMORANDUM OPINION AND ORDER

On December 1, 2017, federal law enforcement agents seized $830,000 in cash from Lev Sigal and Nickolay Antonov after the two men boarded an Amtrak train at Chicago's Union Station. Gov. Exh. 1, Report of Investigation. ¶ 1. The government then instituted a forfeiture action under 21 U.S.C. § 881(a)(6).[1] R. 2, Compl. ¶ 1.[2] Sigal and Antonov (for convenience's sake, referred to together as the Claimants) filed a claim for the money. The Claimants have moved to suppress the seizure of the money. R. 25, Mot. Suppress. On December 7, 2018, this Court held a suppression hearing on the motion. R. 44, 12/7/18 Minute Entry. During the hearing, Drug Enforcement Administration Task Force Officer Arnold Martinez and DEA Special

---

[1]The Court has jurisdiction over this action under 28 U.S.C. § 1355(a). Because the United States commenced this action, this Court also has jurisdiction under 28 U.S.C. § 1345.

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. The exhibits introduced during the suppression hearing are not on the docket, but the parties' exhibit lists are. R. 39, Claimants' Exh. List; R. 42, Gov. Am. Exh. List.

Agent Kevin Frankel testified. Neither Sigal nor Antonov testified. For the reasons discussed below, the Claimants' motion to suppress is denied.

## I. Background

On the morning of December 1, 2017, Task Force Officer Martinez reviewed the travel itineraries of Amtrak passengers at Chicago's Union Station. A little over a week earlier, on November 22, 2017, Sigal had bought two first-class Amtrak tickets with a credit card. The tickets were for travel from Union Station to Emeryville, California on November 30. Claimants' Exh. 1, Amtrak Receipt. A few minutes after his initial purchase, Sigal changed the travel date to December 1, paying an extra charge to make the change. *Id.* At the suppression hearing, Officer Martinez testified that when he reviewed the train manifest, the Claimants' travel itinerary caught his eye for several reasons. Among the reasons: Emeryville is supposedly a drug-source city; and almost immediately after buying the original tickets, Sigal exchanged them for higher-priced tickets. Martinez did an independent online search for information about Sigal and Antonov, and also sent their names to DEA data analysts to run a search. The only information Martinez generated and received from these searches was a photograph of Sigal from a LinkedIn page.

Both agents testified that the next step of their investigation was to question Sigal and Antonov, as well as several other passengers that Martinez had decided to investigate. On the train platform, Agent Frankel saw two people whom he believed to be Sigal and Antonov, each carrying a backpack and a small roller suitcase. But the agents did not speak to Sigal and Antonov then. According to Agent Frankel, he

did not start the questioning on the train platform because it would be more efficient to board the train to question all the subjects and there would be little doubt as to the passengers' identities if they were in their assigned train car. The agents approached the Claimants' room at around 1:40 to 1:45 p.m. Both agents saw Sigal standing in the room and Antonov sitting on a seat in the room. The agents recognized Sigal from his LinkedIn photograph, and as the agents stood in the hallway outside the room, they asked the Claimants for their names. Report of Investigation. ¶ 2. The agents were dressed in plain clothes, and although they both were carrying firearms, they never displayed them or told the Claimants that they were armed.

After Sigal and Antonov identified themselves, Officer Martinez displayed his DEA badge, supposedly for around 30 seconds, and identified himself as a federal agent. He then asked to see Sigal's and Antonov's driver's licenses and boarding passes. Both agents testified that the Claimants handed those things to Martinez, and he returned them after reviewing them for around 30 seconds. Sigal's declaration disputes those facts, instead alleging that the officers only "motioned toward a badge of some sort" and "did not say they were Drug Enforcement Administration agents." R. 25-1, Sigal Decl. ¶¶ 2-3. Sigal also contends that the agents did not return his driver's license immediately, but rather held onto it for the duration of the encounter. *Id.* ¶ 4.

Both agents testified that the Claimants appeared nervous during the interaction; Officer Martinez testified that Sigal's hand visibly shook when he gave his driver's license to Martinez. Before asking any more questions, both agents tried

to calm Sigal down, telling him that neither he nor Antonov were under arrest and that they had not done anything wrong. Agent Frankel testified that, because Sigal was standing when the agents initiated the encounter, Frankel told Sigal that he could sit down if he wanted to, and also told Sigal that there was no problem and he could relax. During the hearing, Officer Martinez similarly testified that he also told Sigal to "sit down and relax." Both agents stated that they used a calm tone of voice and did not yell or swear at the Claimants. Sigal did sit down in his seat.

According to the agents' testimony, they explained to Sigal and Antonov that because there was no security at Chicago Union Station before passengers got on the train—specifically no "TSA" agents (that is, Transportation Security Administration agents) checking bags, no x-ray machines, or any other screening—the agents were there to do random interviews for the safety of passengers and Amtrak employees. Officer Martinez did not identify himself as a TSA agent, but rather mentioned it as a way of explaining why he and Agent Frankel had approached the Claimants. In contrast, Sigal's declaration states that Martinez showed a badge "of some sort" and then mentioned the agents were with TSA, stating something to the effect that the Claimants "need[ed] to submit to a security check." Sigal Decl. ¶ 2. Martinez then proceeded to ask questions of Sigal and Antonov, including whether they had checked any luggage. The Claimants said they had not, and Martinez then asked a few questions about the contents of the luggage in the room with them. Report of Investigation. ¶ 8; Sigal Decl. ¶ 3.

When Office Martinez first arrived at the Claimants' room, the only luggage that he noticed were two backpacks. As noted earlier, Agent Frankel had seen Sigal and Antonov on the train platform before boarding, each with a backpack and a roller bag. By the time Martinez started asking questions about the Claimants' luggage, both agents not only had seen the two backpacks, but also had observed a black roller bag with a backpack on top of it next to Antonov. Martinez testified that he then asked the Claimants if they packed their own luggage, if they knew the contents of their luggage, and if anyone had given them anything to put in their luggage. The Claimants responded "no" to all three questions. Martinez also asked whether their luggage contained contraband, including any illegal drugs or weapons, or if it contained very large amounts of money. The Claimants again responded no.

Both agents testified that Officer Martinez asked for permission to search the Claimants' bags, and that both Sigal and Antonov gave consent. Sigal's declaration asserts that he gave his backpack to the agents because he "believed that [it] was a mandatory screening." Sigal Decl. ¶ 5. The agents searched the backpacks but did not find any contraband. Report of Investigation. ¶ 11. Martinez testified that when he returned Sigal's backpack to him, Martinez noticed a gray roller bag sitting next to Sigal. The roller bag was mostly covered by a coat, but the bottom of it was visible to Martinez from outside of the room. Sigal's declaration contends that, after searching the backpacks, the agents stepped into the room and noticed the two roller bags. Sigal Decl. ¶ 5. But Martinez testified that the bag was visible to anyone standing in the hallway outside the room. At the hearing, Martinez stated that when he asked Sigal

for permission to search that bag, Sigal responded that there was a lock on it. In response to Martinez's request for him to open it with the key, Sigal took a key out of his pocket and unlocked the bag (although it took him several attempts because he was shaking). After unlocking it, Sigal pushed the bag to Martinez, who was standing outside the doorway to the room, about 1½-feet away from where Sigal was sitting. As soon as Martinez opened the bag, a large vacuum-sealed plastic bag containing bundles of money fell out onto the floor. Sigal said, "Wow," and that he "did not know" what it was.

Next, Officer Martinez asked the Claimants what was in the black roller bag next to Antonov. Sigal responded, "Same thing," and Martinez testified that he understood that to mean that there was money in that bag too. Then Martinez asked Antonov for permission to check the black roller bag. Martinez testified that Antonov consented, and when requested, Antonov unlocked the combination lock on the bag and handed the bag to Agent Frankel. When Frankel searched the bag, he also found money in it. Martinez asked if there was a million dollars, and Sigal said there was not that much. Sigal's declaration asserts that the agents did not ask for consent, but rather instructed the Claimants to open the roller bags. Sigal Decl. ¶ 4.

Both agents testified that because of safety and space concerns, at no time did they enter or reach into the Claimants' room. Instead, they conducted the entire interview from the hallway, outside of the sliding door to the room. They also testified that they never raised their voices or touched either Sigal or Antonov. Although there

is a written consent-to-search form that the agents could have used, they testified that they did not present it to the Claimants because of time concerns.

After the agents found the cash and the interview had ended, Officer Martinez told the Claimants that the money was going to be seized for an investigation and asked if they wanted a receipt. Agent Frankel testified that the agents told Sigal and Antonov several times that they were not in trouble but could come with them to get a receipt. The Claimants told the agents that they did not want to leave the train and wanted the receipt to be mailed to them. Martinez testified that he then asked if they wanted the receipt mailed to the addresses on their driver's licenses, and when the Claimants said yes, Martinez asked to see their licenses again. The Claimants then handed over their licenses again, and Martinez took a picture of them. Frankel also took a photo of Sigal and Antonov sitting in their seats before the agents left the train at around 1:56 p.m.

Sigal and Antonov both filed claims asserting "an ownership and possessory interest in, and the right to exercise dominion and control over, all or part of the above $830,000 defendant property." R. 6, 7. They then moved to suppress all evidence seized during their encounter with the agents. Mot. to Suppress. This Court held a suppression hearing on December 7, 2018, during which Martinez and Frankel testified, but neither Sigal nor Antonov testified.

## II. Standard of Review

A civil forfeiture operates against the property itself, under the theory that the property itself is guilty of wrongdoing. *See United States v. Funds in the Amount of*

*One Hundred Thousand & One Hundred Twenty Dollars ($100,120.00)*, 901 F.3d 758, 768 (7th Cir. 2018). The pertinent statute here is 21 U.S.C. § 881, which provides for the forfeiture of money (among other things) furnished or intended to be furnished in exchange for a controlled substance, all proceeds traceable to a drug deal, and all moneys used or intended to be used to facilitate a federal drug trafficking violation. The government bears the burden of establishing, by a preponderance of the evidence, that the property is subject to forfeiture. *United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 454 (7th Cir. 2005) (citing 18 U.S.C. § 983(c)(1)).

The Fourth Amendment protects individuals against unreasonable searches and seizures. As a general matter, the "seizure of personal property is per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *See United States v. Jackson*, 598 F.3d 340, 346 (7th Cir. 2010) (cleaned up).[3] Courts "exclude the fruits of unreasonable searches on the theory that without a strong deterrent, the constraints of the Fourth Amendment might be too easily disregarded by law enforcement."[4] *Sanchez-Llamas v. Oregon*, 548 U.S. 331,

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

[4]Various Circuits have held that the exclusionary rule applies to civil forfeiture proceedings because they are quasi-criminal in nature. *See, e.g.*, *United States v. $291,828.00 in U.S. Currency,* 536 F.3d 1234, 1236-38 (11th Cir. 2008) ("The Fourth Amendment exclusionary rule applies to civil forfeiture actions."); *United States v. $493,850.00 in U.S. Currency,* 518 F.3d 1159, 1164 (9th Cir. 2008) ("The exclusionary rule applies in civil forfeiture cases. It bars the admission of evidence obtained in violation of the U.S. Constitution, as well as fruits of the poisonous tree.") (cleaned up). But the Seventh Circuit

349 (2006). But a warrantless search is permissible if the government obtains voluntary consent from an authorized person. *United States v. Hicks*, 650 F.3d 1058, 1064 (7th Cir. 2011). The determination of voluntariness requires applying an objective standard: it is measured by whether a *reasonable* observer would conclude that the person's consent was voluntary. *United States v. Grap*, 403 F.3d 439, 443-44 (7th Cir. 2005). Whether consent is "voluntary is dependent upon the totality of circumstances." *Id.* at 443. "The government must prove by a preponderance of evidence that consent was freely and voluntarily given." *United States v. Richards*, 741 F.3d 843, 848 (7th Cir. 2014) (cleaned up). So the dispositive issue for this suppression motion is whether the government proved, by a preponderance, that Sigal and Antonov voluntarily gave the agents consent to search their roller bags.

---

has expressed some uncertainty about whether the exclusionary rule should apply in civil forfeiture proceedings. *See United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 818 (7th Cir. 2013); *United States v. Marrocco,* 578 F.3d 627, 642-43 (7th Cir. 2009) (Easterbrook, J., concurring) ("Suppressing the *res* in a civil proceeding ... would be like dismissing the indictment in a criminal proceeding whenever the defendant was arrested without probable cause."). The Seventh Circuit has held, however, that Rule G(8)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, which provides that "[i]f the defendant property was seized, a party with standing to contest the lawfulness of the seizure may move to suppress use of the property as evidence," has the force of statute. *$304,980.00 in U.S. Currency*, 732 F.3d at 818. Under that rule, claimants may move to suppress the seizure of the property. In any event, the Seventh Circuit has suggested that it is awaiting a clearer signal from the Supreme Court before barring suppression motions in civil forfeiture cases. *Marrocco*, 578 F.3d at 643. And like its litigative position in other civil forfeiture cases, the government has not objected to the filing of the suppression motion in this case. *See, e.g.*, *United States v. $96,480.00 in United States Currency*, 2017 WL 1021292, at *5 (S.D. Ill. Mar. 16, 2017).

### III. Analysis

### A. Credibility Findings

As noted earlier, Task Force Officer Martinez and Agent Frankel testified during the suppression hearing. But neither Sigal nor Antonov did. So the Claimants' version of events relies on any favorable facts elicited from the agents' testimony, as well as on Sigal's under-oath declaration. The declaration was attached to the motion to suppress, R. 25-1, and was allowed into evidence during the suppression hearing. The Federal Rules of Evidence do not apply in full force to suppression hearings, so Sigal's declaration is not automatically excluded from consideration as inadmissible hearsay. Fed. R. Evid. 104(a), 1101(d)(1); *see United States v. Watson*, 87 F.3d 927, 930 (7th Cir. 1996) (holding that, "aside from privilege, exclusionary rules should not apply in a proceeding in which the court itself is considering the admissibility of evidence," including during suppression hearings) (citing *United States v. Matlock*, 415 U.S. 164, 173 (1974)); *see also United States v. Ozuna*, 561 F.3d 728, 736-37 (7th Cir. 2009) ("[T]he Rules of Evidence do not apply at pre-trial admissibility hearings. Rule 104(a) makes this explicit.") (citations omitted). So the Court may receive the evidence and give it whatever weight it deserves. *Matlock*, 415 U.S. at 175.

But because Sigal decided not to testify at the suppression hearing, the government did not have the chance to cross-examine him. That lack of live, adversarial testing weakens the probative force of Sigal's declaration. And the Court did not have a chance to observe Sigal's demeanor on the witness stand, whether on direct examination or cross-examination. That too weakens the persuasive value of

the declaration. *See United States v. Raddatz*, 447 U.S. 667, 679 (1980) (discussing the "problems of making credibility determinations on the cold record"); *United States v. Bell,* 585 F.3d 1045, 1049 (7th Cir. 2009) (the strength of a search warrant affidavit is enhanced when "the informant personally appeared and testified before the issuing judge, thus allowing the judge to assess his credibility"). In contrast, both Officer Martinez and Agent Frankel testified and subjected themselves to cross-examination. Although the Claimants' counsel scored a few points during cross-examination,[5] the Court finds that both Martinez and Frankel testified credibly and, for the most part, they testified consistently with one another. So the Court will analyze the consent issue based largely on the version of the events supplied by the agents.

## B. Consent

### 1. Scope of the Consent

The threshold questions are whether Sigal and Antonov consented to a search, and if so, what was the scope of the consent. "The scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The parties agree that, during the encounter on the train, Officer Martinez asked for consent to

---

[5]The Claimants attacked Officer Martinez's credibility with a factual inaccuracy in the civil forfeiture complaint, which Martinez verified as true via an affidavit attached to the complaint. R. 2-1, Martinez Aff. ¶ 2. The complaint inaccurately alleges that Sigal initially bought the train tickets for same-day travel. Compl. ¶ 8. In fact, Sigal bought the tickets on November 22 for travel on November 30 (later changed to December 1). Claimants' Exh. 1, Amtrak Receipt. Based on the circumstances and Martinez's demeanor at the hearing when he was challenged on this point, the Court concludes that he made a simple mistake in averring to the accuracy of that allegations—he did not intentionally lie about that point. Indeed, in the two reports prepared by Martinez before the filing of the complaint, there was no similar misstatement about buying the tickets on the same day of travel. Report of Investigation; Gov. Exh. 2, Amtrak Report. This was an oversight, and not one that was so serious that it damns the remainder of Martinez's testimony.

search the Claimants' "bags" before the agents searched the *backpacks*. Sigal Decl. ¶ 5. At the hearing, the agents testified that Sigal and Antonov both gave consent in response to the request for permission to search.[6] More specifically, Martinez testified that both Sigal and Antonov gave consent and "just said yes." Agent Frankel testified that Martinez asked the Claimants if they minded if he searched their bags, and they said no (that is, they did not mind) and handed the agents their backpacks. That is the sort of mild inconsistency (whether the question was put as "do you consent" versus "do you mind if we search your bags") that is not surprising when two people testify about a conversation that happened around one year in the past.

The Claimants argue that, even if they gave consent to search their "bags," the consent was limited to their *backpacks*, and did not apply to their roller bags. In support of that limitation, the Claimants argue that, at the time Officer Martinez asked for consent, only the backpacks were visible, so the consent could only apply to the backpacks. Sigal Decl. ¶ 5. But the factual premise of the argument—that only the backpacks were visible—is not exactly right. First, Martinez credibly testified that, when he asked for consent to search the bags, he in fact had noticed the roller bag that was next to Antonov. Not only did Martinez testify credibly on that point during the hearing, his testimony is supported by the very small size of the room. The

---

[6]Sigal's affidavit does not directly dispute this, but rather states that he handed his backpack to the agents because he believed that it was a mandatory screening. Sigal Decl. ¶ 5. Whether the consent given was voluntary is addressed in the next section. The declaration also does not specify that the Claimants verbally said "yes" in response to Officer Martinez's request, implying that they did not affirmatively say yes. But neither Claimant testified, and the agents' testimony was credible. So the Court credits the agents' version of events on this point.

photos submitted by both sides show a room that could barely fit two adults, let alone easily hide two roller bags. Gov. Exhs. 7, 8, 9, 10; Claimants' Exhs. 3, 4. Also, Sigal's roller bag was visible from the hallway outside of the Claimants' room, even if Martinez himself had not specifically noticed it before asking for consent. So, even though Martinez had not seen Sigal's roller bag, there was every reason for Martinez—and more importantly, objectively speaking, for a reasonable officer—to believe that the consent applied to the roller bags, not just to the backpacks. Indeed, at this point, Frankel knew there were at least four bags in the room, because he had seen the Claimants with the roller bags on the train platform.[7] What's more, Martinez testified that he asked for consent *after* he asked if they had checked in any luggage, and the Claimants answered that it was all with them. At this point, Martinez also had told the Claimants that they were interviewing random passengers for the purpose of passenger safety: a reasonable person would understand that consenting to a search of the "bags" in this circumstance included *all* the luggage in the room, not just half of the bags; a limited search like that would undermine the point of the safety check. So even if the Claimants subjectively *believed* that they had only consented to a search of their backpacks, their subjective belief did not manifest itself in a way that would prompt a reasonable officer to think that the consent applied only to the backpacks.

---

[7]Of course, Agent Frankel's knowledge is only relevant to understanding how a reasonable officer would have understood the interaction; Frankel's subjective intent is not directly relevant to the consent question. *See Jimeno*, 500 U.S. at 251.

It is true that if this initial consent had *not* included all of the bags, then consent would have been a much closer call. At the hearing, Officer Martinez testified that when he moved on from the backpacks to the roller bag and asked Sigal to open it, Sigal responded, "There [is] a lock on it." Martinez then asked Sigal whether he had a key and could open it for Martinez, after which Sigal produced the key and unlocked the roller bag.[8] That set of facts does not necessarily add up to consent, because Sigal might just have been following a directive to open the roller bag.[9] With regard to the roller bag next to Antonov, Officer Martinez and Agent Frankel testified that Antonov gave consent to search it when asked. When asked for specifics of that back-and-forth, Frankel testified that, after Martinez found the cash in the first roller bag, Martinez asked if there was also money in the second roller bag, to which Sigal said yes. That interaction too does not, standing alone, necessarily amount to consent.

Having said that, the initial consent did cover the roller bags, and there was certainly no revocation of the initial consent, so there is no need for a finding on whether the later interaction standing alone qualified as consent. Indeed, Martinez's description of the later interaction—that is, asking Sigal whether he had a key to open the roller bag—is perfectly consistent with the finding that the initial consent covered the roller bag. Since Martinez *already* had the Claimants' consent to search

---

[8]Agent Frankel testified that Martinez asked for consent to search the other bags in the room, and the Claimants said "okay." But Frankel did not elaborate on this point, and then went on to testify that when Martinez asked to search the roller bags, Sigal responded by saying there is a lock on it.

[9]The Court hastens to add that Sigal's compliance in producing the key and unlocking the roller bag without a verbal answer is *not* a revocation of the earlier-given consent. *See $304,980.00 in U.S. Currency*, 732 F.3d at 820 ("[P]olice officers do not act unreasonably by failing to halt their search every time a consenting suspect equivocates.").

the bags generally, there is no reason he would have asked *again* for another round of express consent to search the roller bags. The reality is that most law enforcement agents, having obtained a broad consent to search, will not prompt the subjects of the search yet again with subsequent follow-up requests for express consent as they open-up each container.

It is worth noting that, in future investigations, federal agents at Union Station should seriously consider asking for a written consent to search that dispels any question (or at least narrows the dispute) about whether consent was given and the scope of it. A consent-to-search form can readily be tailored for Union Station searches; for example, the form could specify that the consent is for all luggage, bags, or any other containers. Indeed, the Claimants here could have sought discovery in an effort to rebut the protestations of the agents that they did not have time to deal with written consent forms. For example, the Claimants could have sought information (probably with some redactions to protect confidential information) about how many other passengers on the train were targeted for interviews, why the agents started the interview when they did (about 15 minutes before the train's departure time), whether there is a policy on obtaining written consent, and so on.[10] But the Claimants expressly stated that no discovery was needed, R. 29, and indeed there might be valid cost or other strategic considerations that justified eschewing

_____

[10]With the increased use of body cameras by law enforcement, this too will become an issue in the future. Aside from privacy concerns, which can be addressed by strict retention and deletion protocols for encounters that do not result in seizures, there may be no good reason why Union Station agents do not wear and activate body cameras when they initiate their interactions.

discovery. In any event, the absence of written consent here does not undermine the agents' testimony about the scope of the initial consent.

## 2. Voluntariness of the Consent

So Sigal and Antonov did consent to a search of the roller bags. The next question is whether that consent was given freely and voluntarily. Courts consider all relevant circumstances in deciding the voluntariness question, including the age, education, intelligence, and capability of the person giving consent; whether the person gave consent immediately or only after repeated requests by the police; whether the officers used physical coercion to obtain consent; and whether the person giving consent was in custody. *Grap*, 403 F.3d at 443. Courts also consider whether the officers explicitly told the subjects that they can refuse to consent, but the absence of that sort of notice is not dispositive. *Id.* Indeed, no one factor is necessarily dispositive; instead, the Court must consider all of the surrounding circumstances. *Id.* These factors are viewed in light of "objective facts, as presented to a reasonable inquirer, that would reasonably put him or her on notice that a voluntary consent could not be given." *Id.* at 445.

The facts support a finding that Sigal and Antonov provided a voluntary consent. First, there was no suggestion that the Claimants did not understand what was being asked when Officer Martinez asked for consent to search their bags. There was no evidence presented that Claimants were of below-average intelligence or education. Although Sigal said something to Antonov in a different language at one point during the encounter, Martinez testified that he never had trouble

communicating with the Claimants, nor did he have any concern about whether they understood English. At the time of the encounter, Sigal and Antonov were 37 and 42-years old, respectively, so there is no concern that they were either too young or too old to understand what was being asked of them. Gov. Exhs. 19-20.

Second, as discussed earlier in this Opinion, Sigal and Antonov consented to the search of their bags the very first time that Officer Martinez asked for permission. The agents did not make repeated requests or brow-beat them in any way for the consent. There was no back-and-forth on the initial consent, which covered the roller bags.

Next, although the Claimants were not formally arrested at any point, they argue that they did not feel free to leave or to refuse the search based on (1) the actions and location of the agents during the encounter, combined with an alleged command to "sit down and relax"; and (2) the agents' alleged misrepresentation that they were associated with TSA. The parties present these arguments as a question of whether the Claimants were seized, as well as a question of voluntary consent. Mot. Suppress at 8-13; R. 31, Gov. Resp. at 11-12. The seizure and consent issues do go hand-in-hand, because if the Claimants were unlawfully seized, then any contemporaneously granted consent is also presumptively invalid. *Huff v. Reichert*, 744 F.3d 999, 1008 (7th Cir. 2014). When deciding whether a person was seized within the meaning of the Fourth Amendment, the Court must consider whether under "all of the circumstances surrounding the encounter … a reasonable person

would feel free to decline the officers' request or otherwise terminate the encounter." *United States v. Drayton*, 536 U.S. 194, 201-02 (2002).[11]

As the government correctly points out, simply because the agents approached the Claimants when they were in the "confined area" of their room on the train does not necessarily make the encounter a seizure. *See Drayton*, 536 U.S. at 201-02 ("A passenger may not want to get off a bus if there is a risk it will depart before the opportunity to reboard. A bus rider's movements are confined in this sense, but this is the natural result of choosing to take the bus; it says nothing about whether the police conduct is coercive.") (cleaned up). In this case, there was nothing confrontational or coercive about the interaction: the agents were dressed in plain clothes instead of uniforms. Officer Martinez showed his badge to the Claimants when he identified himself as a law enforcement officer, which is a routine start to an encounter with an officer and was not accompanied by any acts of intimidation. *See id.* at 204. Although both agents carried guns, those guns were never visible to the Claimants, let alone drawn or brandished. *See id.* at 204-05. The agents credibly testified that they never raised their voices, did not swear or use harsh language with the Claimants, and never touched them. Indeed, when Sigal acted with extreme nervousness, Agent Frankel made a point to try to put the Claimants at ease, telling him that they were not in trouble and to relax.

---

[11]The government has defended against the unreasonable-seizure argument solely on the grounds that no seizure occurred. Put another way, the government has *not* argued that there was reasonable suspicion for an investigative seizure or probable cause for an arrest. So the evidence concerning Officer Martinez's suspicions about the travel itinerary really was only offered for background information on why Martinez targeted Sigal and Antonov, rather than for any substantive purpose.

With regard to the agents' physical location, both agents credibly testified that they never stepped into the Claimants' room, but rather stayed in the hallway. Despite Sigal's written declaration to the contrary, the objective facts also support the agents' testimony. First, the photos introduced by the Claimants themselves show a room with very little standing room; there is at most two-feet width worth of space between the two seats. Claimants' Exhs. 3, 4. Second, as Agent Frankel testified, safety concerns would caution against the agents entering a very small room with two tall and large investigative subjects in it (both Sigal and Antonov are over 6 feet tall, R. 19, R. 20). So the Court finds that the agents did not enter the room. Indeed, the Court credits Agent Frankel's testimony that the Claimants could have slid the sliding door closed, and shut the agents out of the room, because the agents were standing in the hallway during the entire encounter.

The Claimants also argue that when Agent Frankel told Sigal to "sit down and relax," it was an order that "conveyed a message that compliance with their requests [was] required." Mot. Suppress at 10 (citing *United States v. Jerez*, 108 F.3d 684, 692 (7th Cir. 1997)). But both agents' testimony, which this Court credits, contradicts this depiction of the statement. According to the agents, after they introduced themselves, Sigal was standing and was visibly nervous, his hands shaking. So Frankel told Sigal to "sit down and relax if he would like"—not as a command amounting to a seizure, but in an effort to calm Sigal's nerves. Frankel also assured the Claimants that they were not in any trouble. A reasonable person would not have taken the "sit down and

relax" statement as a command, and instead would have believed that he still could terminate the encounter.

Another argument advanced by the Claimants is that the agents held onto their driver's licenses for the entire encounter, so they did not feel like they could terminate the encounter for fear of not getting that crucial piece of identification back. That argument is based on the assertion to that effect in Sigal's declaration. Sigal Dec. ¶ 4. But the Court believes the agents' testimony that, at the outset of the encounter, they returned the driver's licenses after confirming the Claimants' identities. *See United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008) (citing cases and explaining, "Where the officers only generally identified themselves as narcotics investigators and immediately returned the defendant's identification and travel documents, we held the initial consensual encounter did not ripen into a seizure."). There is nothing that the agents said or did to prevent Sigal or Antonov from feeling that they could terminate the encounter or refuse to consent to the search.[12]

The Claimants' final argument is that they believed that the search was mandatory because Martinez and Frankel allegedly said that they were the equivalent of Transportation Safety Administration officers. According to the Claimants, the search was unreasonable because the agents "induce[d] consent by

---

[12]It is true that the agents never told the Claimants that they could refuse to consent to the search. But the absence of that advice is not fatal to a finding of voluntariness (or to a finding that no seizure was effectuated). *See United States v. Radford*, 856 F.3d 1147, 1149 (7th Cir. 2017) (affirming finding of voluntariness, despite absence of advice, where police officer did not threaten the defendant and did not tell her that she must answer his questions). Here, all the other circumstances point in favor of a finding of voluntariness and that no seizure occurred.

'deceit, trickery or misrepresentation.'" Mot. Suppress at 10 (quoting *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977)). But neither the facts nor the law supports this argument.

First, the evidence shows that the agents did *not* represent themselves to be TSA officers or their equivalent. Officer Martinez explained to the Claimants that the agents were conducting random interviews for the safety of Amtrak passengers and employees, and Martinez specifically informed the Claimants that the reason for random interviews was due to the *absence* of TSA officers or other security measures, like x-ray machines, at Union Station. It was a prepared statement that Martinez often uses when approaching passengers for interviews so that he can explain the purpose of the encounter. Without an explanation like that, passengers might very well feel targeted and feel even more apprehensive about the encounter. Despite Sigal's written (and untested) declaration to the contrary, the Court credits Martinez's in-court testimony that he showed his DEA badge to the Claimants for more than just a split-second and that neither Claimant expressed any confusion about what agency the agents worked for.

In the same vein, the Claimants also complain that the questions posed by the agents about the luggage were "TSA-style questions," Sigal Decl. ¶ 3, and so were designed to give the false impression that the agents were with TSA or were TSA's equivalent at the train station (which would in turn give the impression that the search was mandatory). But a reasonable person would understand that *any* law enforcement agent, including agents conducting random interviews and voluntary-

consent searches, would ask questions about whether the passengers packed the luggage and whether the passengers know what is in the luggage. If a passenger were to answer that they did not know what was in the luggage, then obviously any agent would be on higher alert in conducting the subsequent search, assuming consent was given for the search. So the questions are sensible and no reasonable passenger would think that the agents were in effect telling them, via the questions, that the search was a quasi-TSA mandatory search. On top of this, Martinez then *asked* for consent, which is not the natural follow-up to an instruction that this was a TSA-equivalent mandatory search.

To be sure, Officer Martinez did employ a subterfuge when he described the purpose of the search to the Claimants: he told them that the agents were conducting "random" interviews. Of course, Martinez in fact had targeted the Claimants as suspicious travelers based on a review of the train itinerary. The Claimants argue that "[c]onsent searches are almost always unreasonable when government agents induce consent by 'trickery, deceit, or misrepresentation.'" Mot. Suppress at 10 (citing *Tweel*, 550 F.2d at 299). But that is wrong. Really, an agent's misrepresentation invalidates consent only when it "undercut[s] the voluntariness of the consent to search," that is, it "overbear[s] a suspect's free will and prevent[s] rational decision-making." *United States v. Peters*, 153 F.3d 445, 463 (7th Cir. 1998) (Easterbrook, J., concurring). The Seventh Circuit has held that when an agent uses deception to gain consent, the resulting search is not involuntary so long as the search does not exceed the scope of consent. *See United States v. White*, 706 F.2d 806, 808 (7th Cir. 1983)

(citing *United States v. Scherer,* 673 F.2d 176 (7th Cir. 1982)). "Deception plays an important and legitimate role in law enforcement. … Much evidence is properly acquired by concealing a person's status as an agent of law enforcement." *Peters*, 153 F.3d at 464 (Easterbrook, J. concurring).

The cases cited by the Claimants are consistent with this proposition, and none support a broad holding that any misrepresentation by an agent automatically invalidates consent. *See Tweel*, 550 F.2d at 299-300 (holding that when a taxpayer asked whether a "special agent" was involved in the investigation and the Internal Revenue Service answered "no" even though the IRS was reporting to a criminal section of the Department of Justice, consent was invalid because the misrepresentation was material in that it suggested the investigation was only civil, not criminal); *United States v. Hrdlicka*, 520 F. Supp. 403, 409 (W.D. Wis. 1981) (agent's misrepresentation about the "nature, scope, and targets of his investigation," combined with an absence of Miranda warnings and advice that suspect need not consent, undermined the voluntariness of the consent); *United States v. Benezario*, 339 F. Supp. 2d 361, 368-69 (D.P.R. 2004) (in dicta, reasoning that search by DEA agents pretending to be U.S. Marshals Service deputies exceeded the scope of the consent given, when suspect consented to let agents search for a fugitive, and they searched areas where "no fugitive could possibly be hiding"); *United States v. Parson*, 599 F. Supp. 2d 592, 603 (W.D. Pa. 2009) (agents investigating child pornography deliberately misled suspect by telling him that he may be a victim of identity theft, which played "an integral role in obtaining his consent," therefore making the

misrepresentation material and his consent the product of coercion). Nothing akin to those cases in which consent was invalidated happened here. There is nothing coercive about telling a passenger that they were approached randomly. If anything, that (false) information would give the passenger more confidence in believing that it would be fine to refuse consent to the search.

No doubt the Claimants would have a strong argument if the agents actually misrepresented that they were TSA officers. The government does not dispute—either in its briefing or during the hearing—that submitting to a TSA officer's administrative search at the airport is mandatory. *See United States v. Aukai*, 497 F.3d 955, 960-61 (9th Cir. 2007). So if federal agents were to falsely identify themselves as TSA officers at Union Station, a reasonable passenger might very well feel that the subsequent search was mandatory and that the passenger had no genuine right to refuse consent. In any event, this Court need not definitively decide the issue, because it is clear from the record that a reasonable person would not have interpreted either agent to be misrepresenting himself as a TSA officer or a TSA equivalent for purposes of a search.

## IV. Conclusion

Based on the record, the government has proven that the Claimants voluntarily consented to a search of their bags, including the roller bags. The motion to suppress is denied. The government and the Claimants shall confer on the next step of the litigation and shall file a joint status report by January 16, 2019 (assuming

the government shutdown has been resolved in time to file the report). At the next status hearing, the Court will set the discovery schedule, if one is actually needed.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: January 2, 2019